# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:25-cr-00025 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge Reuben J. Sheperd |
| | ) | |
| MARCUS COPELAND, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHRISTIAN ROSS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Defendants Marcus Copeland and Christian Ross move to dismiss the indictment separately charging each of them with being felons in possession of a firearm in violation of federal law. Each argues that this prohibition violates his Second Amendment rights. For the reasons that follow, the Court **DENIES** Defendants' motions.

## FACTUAL BACKGROUND

The Court considers the legal question against the following background for each Defendant.

### A.    Mr. Copeland

Defendant Marcus Copeland was born in Elyria, Ohio in 1985. (ECF No. 6, PageID #18.) At the age of 18, in October 2003, he was charged in State court with failure to comply, a third-degree felony, obstructing official business by fleeing on

foot, a second-degree misdemeanor, and driving under suspension, a first-degree misdemeanor. (*Id.*, PageID #21.)  In 2004, he was convicted and sentenced to 45 days in jail and placed on five years of probation. (*Id.*)

On May 17, 2004, Mr. Copeland was arrested for possession of cocaine, a first-degree felony. (*Id.*, PageID #23.)  While that charge was pending:

(1)     Mr. Copeland was convicted of obstructing official business, a second-degree misdemeanor, and received a 30-day suspended sentence. (*Id.*, PageID #24.)

(2)     Also, in September 2004, he was convicted of possessing drug paraphernalia, a fourth-degree misdemeanor, and possession of marijuana, a minor misdemeanor, based on events that occurred in January 2004, and was ordered to pay fines and court costs. (*Id.*, PageID #22.)

(3)     Then, in October 2004, Mr. Copeland was convicted of domestic violence, a first-degree misdemeanor, and sentenced to 90 days in jail. (*Id.*, PageID #24.)

In November 2004, with the case charging Mr. Copeland with first-degree possession of cocaine still pending, officers responded to a complaint about a man with a gun. (ECF No. 40-1, PageID #180.)  When they arrived at the gas station where the suspected vehicle was located, Mr. Copeland fled on foot. (*Id.*) Mr. Copeland was repeatedly ordered to stop, but he refused to comply. (*Id.*) Eventually, he hid behind a dumpster and attempted to remove the contents out of

his jacket pockets, including a large white bag and money. (*Id.*) Officers pursued Mr. Copeland into a wooded area, where he threw aside a knife before he was arrested. (*Id.*) Mr. Copeland told the officers that he and the group that he was with had gotten into an argument with another group of individuals in which he pulled out a knife and threatened to "cut them." (*Id.*, PageID #181.)

At this point, on December 3, 2004, Mr. Copeland resolved the outstanding charges from his arrest in May 2004. He pled guilty to possessing cocaine, a fifth-degree felony, possession of drug abuse paraphernalia, a fourth-degree misdemeanor, and possession of marijuana, a minor misdemeanor. (ECF No 6, PageID #23.) On March 14, 2005, he was sentenced to eight months in prison on the first count, a one-month sentence for the second count, and a $100 fine for the third. (*Id.*) He was released from prison on November 7, 2005. (*Id.*)

In January 2006, Mr. Copeland was again charged with possession of cocaine, marijuana, and drug abuse paraphernalia. (*Id.*, PageID #26.) In April 2006, Mr. Copeland pled guilty to the charges stemming from his arrest in November 2004. (*Id.*, PageID #25.) He was convicted of possessing cocaine, a first-degree felony, carrying a concealed weapon, a first-degree misdemeanor, obstructing official business, a fifth-degree felony, resisting arrest, a second-degree misdemeanor, and possession of drug paraphernalia, a fourth-degree misdemeanor. (*Id.*) He received a four-year sentence on the first count, a three-month sentence on the second count, a six-month sentence on the third count, a one-month sentence on the fourth count, and a one-month sentence on the fifth count, which ran concurrently. (*Id.*)

3

A month later, in May 2006, Mr. Copeland was convicted of possession of cocaine, a first-degree felony, possession of marijuana, a minor misdemeanor, and possession of drug abuse paraphernalia, a fourth-degree misdemeanor based on his arrest in January 2006. (*Id.*, PageID #26.) He was sentenced to 11 months on the first count, a fine for the second count, and one month and a fine for the third count, to run concurrently with his April 2006 conviction. (*Id.*)

*     *     *

Roughly two months after release from prison, in June 2010 at the age of 24, Mr. Copeland was convicted of operating a vehicle while intoxicated, a first-degree misdemeanor, and other misdemeanor driving offenses. (*Id.*, PageID #27.) He received a total of twenty days in jail (more time was suspended), a 180-day license suspension, and two years of supervision. (*Id.*)

In September 2011, when he was 25, Mr. Copeland was convicted of possessing drug paraphernalia, a fourth-degree felony, and was sentenced to 30 days in jail. (*Id.*, PageID #28.) In February 2011, while on probation, Mr. Copeland was convicted of two counts of obstructing official business, a second-degree misdemeanor. (*Id.*) He was sentenced to 30 days on each count consecutive with one another. (*Id.*)

In April 2012, at the age of 26, Mr. Copeland was convicted of fleeing or eluding an officer, a first-degree misdemeanor, and resisting arrest, a second-degree misdemeanor. (*Id.*) He received a 180-day sentence on count one, with 90 days suspended, and a 90-day sentence on count two, which ran consecutively, as well as two years of probation and a license suspension for 180 days. (*Id.*) The same month,

4

Mr. Copeland was convicted of failure to comply with an order or signal of a police officer, a third-degree felony, and received an 18-month sentence and a suspension of his operator's license for 24 months.  (*Id.*, PageID #27.)

In February 2015, now 29 years old, Mr. Copeland was convicted of illegal use or possession of drug paraphernalia, a fourth-degree misdemeanor.  (*Id.*, PageID #29.) In August 2015, Mr. Copeland was convicted of possession of marijuana, a minor misdemeanor, and ordered to pay fines and court costs.  (*Id.*, PageID #30.)  A month later, in September 2015 at age 30, Mr. Copeland was convicted of obstructing official business, a second-degree misdemeanor, and sentenced to 15 days.  (*Id.*, PageID #29.)

In September 2016, when he was 31, Mr. Copeland was convicted of two counts of possessing drugs, a third-degree felony, and having weapons while under disability, a third-degree felony.  (*Id.*, PageID #30.)  He received a 36-month sentence and a 12-month suspension of his license to operate a motor vehicle.  (*Id.*)

\*     \*     \*

In August 2019, at the age of 33, Mr. Copeland was convicted of possession of 100 grams of marijuana, a minor misdemeanor, and was ordered to pay costs.  (*Id.*, PageID #31.)

In October 2024, now 39 years old, Mr. Copeland was charged in State court with having weapons while under disability, a third-degree felony, improperly handling firearms in a motor vehicle, a fourth-degree felony, and carrying a concealed weapon, a fourth-degree felony.  (*Id.*)  He pled not guilty in November 2024.  (*Id.*)  In January 2025, the United States indicted Mr. Copeland in this case for possessing a

5

firearm as a felon—a Taurus caliber semi-automatic pistol—in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8).  (ECF No. 1, PageID #1.)

In summary, Mr. Copeland has a total of nine felony convictions.  As a result of his criminal convictions, Mr. Copeland has been incarcerated, in detention, or under judicial supervision for more than half of his adult life.  His most recent felony conviction came nearly a decade ago, in 2016, on drug charges (and a related weapons charge).  (ECF No. 6, PageID #30.)  He was released from parole on December 17, 2020.  (*Id.*)

### B.   Mr. Ross

Defendant Christian Ross was born in Lorain, Ohio in 1992.  (ECF No. 9, PageID #36.)  He has adult criminal convictions beginning when he turned 18.  (*Id.*, PageID #41.)  In July 2011, officers discovered illegal drugs on Mr. Ross during a traffic stop.  (*Id.*)  He was charged with trafficking in drugs with forfeiture specifications, a fifth-degree felony, trafficking in marijuana, a fifth-degree felony, possession of drugs, a first-degree misdemeanor, possession of drug paraphernalia, a fourth-degree misdemeanor, and possession of marijuana, a minor misdemeanor. (*Id.*)  In June 2012, the State court sentenced Mr. Ross to 12 months of probation. (*Id.*)

In February 2012, while on probation and now 19 years old, Mr. Ross was charged with failure to comply with an order or signal of a police officer, a third-degree felony, obstructing official business, a fifth-degree felony, harassment with a bodily substance, a fifth-degree felony, and resisting arrest, a second-degree

misdemeanor.  (*Id.*)  In June 2012, the State court sentenced him to three years of probation.  (*Id.*)

In May 2013, while on probation, Mr. Ross was charged with disorderly conduct after two women told law enforcement that he had made death threats toward them following an argument.  (*Id.*, PageID #42.)  In August 2013, the State court sentenced him to three years of probation.  (*Id.*)  In October 2013, Mr. Ross was arrested for violation of his probation.  (*Id.*)

In September 2015, at age 22, police officers responded to a report of gunfire coming from Mr. Ross's residence.  (*Id.*)  When they arrived, they observed a handgun holster and two loaded handguns in plain view.  (*Id.*)  Mr. Ross was charged with having weapons while under disability, a third-degree felony.  (*Id.*)

In December 2015, police officers responded to a domestic violence complaint. (*Id.*, PageID #43.)  The victim had "large bruises and swelling on her face, and a large bump on her forehead."  (*Id.*)  She told the police officers that "she was terrified of the defendant."  (*Id.*)  According to the victim, Mr. Ross assaulted her at her residence, and she called the police from a neighbor's house.  (*Id.*)  Mr. Ross remained at her residence with weapons in the home.  (*Id.*)  Mr. Ross was arrested and in January 2016 charged with trafficking in drugs, a second-degree felony, possession of drugs, a second-degree felony, having weapons while under disability, a third-degree felony, receiving stolen property, a fourth-degree felony, possession of drugs, a third-degree felony, possession of drugs, a fifth-degree felony, domestic violence, a first-degree misdemeanor, and obstructing official business, a second-degree misdemeanor.  (*Id.*)

In June 2016, police officers responded to a report of gunfire involving Mr. Ross. (*Id.*, PageID #44.) When police officers arrived, Mr. Ross smelled strongly of alcohol and was found to be in possession of loaded firearms. (*Id.*) After Mr. Ross was taken into custody, he "became highly irate and belligerent," to the point where he had to be placed in a restraint chair. (*Id.*) He was charged with having weapons under disability, a third-degree felony, carrying concealed weapons, a fourth-degree felony, using weapons while intoxicated, a first-degree misdemeanor, and obstructing official business, a second-degree misdemeanor. (*Id.*)

In August 2016, at age 23, the State court sentenced Mr. Ross to 12 months for his September 2015 charges, three years confinement for his January 2016 charges, and 12 months for his June 2016 charges. (*Id.*, PageID #42–44.) In May 2017, he was granted judicial release. (*Id.*) In July 2017, Mr. Ross was found to be in violation of his probation following judicial release. (*Id.*) At age 24, a month after Mr. Ross was granted judicial release, he was charged with assault. (*Id.*, PageID #44.) He was sentenced to 30 days confinement. (*Id.*)

In June 2018, police officers were dispatched to a gas station regarding a male with a firearm. (*Id.*, PageID #45.) Mr. Ross entered the gas station's store with a firearm in his hand and "carelessly placed the firearm onto the counter." (*Id.*) Then, he took the firearm and, "intentionally or unintentionally, pointed the muzzle of the firearm at the store clerk and two other customers." (*Id.*) When Mr. Ross noticed law enforcement, he quickly reentered the store and placed the firearm on the counter, with the muzzle facing the store clerk. (*Id.*) When the police officers arrested

8

Mr. Ross, he "was uncooperative and noticeably intoxicated." (*Id.*, PageID #46.)  On the way to jail, Mr. Ross made several threats to an officer, including that the officer should "watch his back," that he would "shoot a cop in the face," and that Mr. Ross "runs this city." (*Id.*)  Mr. Ross was charged in federal court with being a felon in possession of a firearm and ammunition. (*Id.*, PageID #45.)  In November 2018, Mr. Ross received a sentence of 55 months in prison, followed by three years of supervised release. (*Id.*)  He was released from the Bureau of Prisons in July 2022. (*Id.*)  Mr. Ross tested positive for fentanyl on four occasions in violation of his supervised release, which led to a sentence of six months in prison and one year of supervised release. (*Id.*, PageID #45–46.)  That sentence ended on July 9, 2023. (*Id.*, PageID #45.)

In September 2024, in a case related to this case, Mr. Ross was charged in State court with having weapons under disability, a third-degree felony, improper handling of firearms in a motor vehicle, a fourth-degree felony, and carrying concealed weapons, a fourth-degree felony. (*Id.*, PageID #46.)  As of January 2025, the case had been set for a second pre-trial conference. (*Id.*)  In January 2025, the United States indicted Mr. Ross in this case for possessing a firearm and ammunition as a felon—a Sarsilmaz caliber semi-automatic pistol—in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (ECF No. 1, PageID #2.)

In summary, during his adult life, Mr. Ross has been convicted of 15 felonies. As a result of his criminal convictions, Mr. Ross has been incarcerated, in detention,

or under judicial supervision for more than half of his adult life. His most recent offense was the 2018 federal conviction. (ECF No. 9, PageID #45.)

## STATEMENT OF THE CASE

Both Defendants filed motions to dismiss the indictment, arguing that "18 U.S.C. 922(g)(1) violates the Second Amendment" as applied to Mr. Ross and Mr. Copeland. (ECF No. 27, PageID #115; ECF No. 31, PageID #137.) Further, Mr. Copeland argues that Section 922(g)(1) also violates the Second Amendment facially. (ECF No. 31, PageID #137.) The United States opposes each Defendant's motion by drawing on Supreme Court, Sixth Circuit, and the Court's precedent, as well as relying on the criminal history of each Defendant. (*See* ECF No. 38, PageID #163–68; ECF No. 39, PageID #170–76.) Also, the United States filed a notice of supplemental authority. (ECF No. 40; ECF No. 40-1.)

## ORAL ARGUMENT

Normally, the Court's practice is to hear oral argument on significant motions such as these, especially in an area with developing case law. However, in light of the fact that the Court decided two other argued cases on the same day raising a Second Amendment challenge, the issues the motions to dismiss raise have received fulsome consideration. Further, the methodology that *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), mandates involves complex historical analysis best conducted at one time. Therefore, in the interest of judicial economy, the Court makes a rare exception to its practice of holding oral argument and decides the matter on the record and briefs submitted.

## GOVERNING LEGAL STANDARD

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Under the Fifth and Sixth Amendments, an indictment must "contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend." *Hamling v. United States*, 418 U.S. 87, 117 (1974). A defendant may move to dismiss a defective indictment for "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). On a motion to dismiss, the Court must read the indictment "as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications." *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007). A defendant may move to dismiss an indictment for failure to state an offense on the basis that the "statute apparently creating the offense is unconstitutional." *United States v. Rathburn*, 771 F. App'x 614, 623 n.8 (6th Cir. 2019) (quoting *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973)).

### A. Nature of the Challenge

Both Defendants bring as-applied challenges to the constitutionality of 18 U.S.C. § 922(g)(1), and Mr. Copeland raises a facial challenge to preserve the issue for appeal. A law is facially unconstitutional if "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U. S. 739, 745 (1987). In contrast, an as-applied challenge tests only whether the contested "law is unconstitutional as enforced against the [party] before the court" based on the discrete facts in the case. *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013).

11

"Facial challenges are disfavored." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008). "The 'usual judicial practice' is to address an as-applied challenge before a facial challenge . . . ." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 327 (6th Cir. 2009) (en banc) (citation omitted). However, the Sixth Circuit has already rejected a facial challenge to Section 922(g)(1), holding that it may be constitutionally applied in some instances. *See United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024). So has this Court. *United States v. Berry*, 723 F. Supp. 3d 567, 573 (N.D. Ohio 2024), *aff'd*, No. 24-3769, 2025 WL 1082376 (6th Cir. Apr. 10, 2025). These decisions dispose of Mr. Copeland's facial attack on the statute.

**B.  Second Amendment Standard**

Previously, the Court analyzed in depth the Supreme Court's Second Amendment precedents in *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago, Illinois*, 561 U.S. 742 (2010), and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), as well as other case law discussing the constitutionality of Section 922(g)(1) and the history and tradition of federal firearms regulation. *See Berry*, 723 F. Supp. 3d at 580–92; *see also United States v. Hostettler*, 729 F. Supp. 3d 756, 761–62 (N.D. Ohio 2024). The Court relies on its prior analysis in *Berry*, though it does not repeat it here in its entirety.

**B.1.  Key Determinations in *Berry***

For present purposes, based on the text of the Second Amendment and the history and tradition of federal firearms regulation, in its ruling in *Berry* the Court made four key determinations:

*First*, "[f]or most of our history . . . the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens." *Berry*, 723 F. Supp. 3d at 586–87 (quoting *Heller*, 554 U.S. at 625).  In fact, federal law historically expanded access to firearms. *See Range v. Garland*, 69 F.4th 96, 104 (3d Cir. 2023) (en banc).  Not until the New Deal era did Congress enact "the first major federal firearms law" as an exercise of its taxing power, the National Firearms Act. *Heller*, 554 U.S. at 637 (Stevens, J., dissenting).  And the Gun Control Act of 1968 enacted the statute from which Section 922(g)(1) descends.

*Second*, despite the historical expansion of access to gun rights, the Nation's history also embodies a tradition of disarming individuals, at least temporarily, who possess some permissible disqualifying characteristic—such as dangerousness. *Berry*, 723 F. Supp. 3d at 589–90, 592.  A dangerous individual is one "whose gun possession threatens others." *Id.* at 590 (canvassing authority).  In Section 922(g)(1), Congress chose to make a prior felony conviction disqualifying for firearm possession. But using felon status as a proxy for dangerousness is both under- and over-inclusive. *Id.*  Under *Bruen*, using felon status as a proxy for dangerousness requires analyzing whether the statute presents a "distinctly similar" restriction as the history of disarming dangerous individuals that justifies the statute's burden on the right of armed self-defense.  *Id.*  As noted below, the Supreme Court has since refined this aspect of the analysis.

*Third*, "the historical record generally shows that laws providing for disarmament of particular individuals were delimited in time or afforded them a

13

means for restoration of the right to keep and bear arms." *Id.* at 592. Simply put, "none of the historical regulations . . . permanently disarm a group of people." *Id.* (quoting *United States v. Williams*, 718 F. Supp. 3d 651, 677 (E.D. Mich. 2024)). Even the sweeping Gun Control Act of 1968, which criminalized firearm ownership after a felony conviction, "afforded felons a pathway to restoration of the right to bear arms." *Id.* at 588 (quoting 18 U.S.C. § 925(c)).

*Fourth*, in *Berry* the Court noted that the United States bears the burden of "affirmatively prov[ing] that [Section 922(g)(1) is part of the historical tradition" that delimits the outer bounds of the right to keep and bear arms. *Id.* at 581 (quoting *Bruen*, 597 U.S. at 19). As discussed below, subsequent decisions affect this analysis.

### B.2.  Subsequent Developments

After *Berry*, the Supreme Court decided *United States v. Rahimi*, 602 U.S. 680 (2024), which rejected a facial challenge to a conviction under a different subsection of the statute at issue. Additionally, the Sixth Circuit decided *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024), among other cases addressing the constitutionality of charges under Section 922(g)(1).

### B.2.a. *Rahimi*

In *Rahimi*, the Supreme Court took up the constitutionality of 18 U.S.C. § 922(g)(8), which prohibits a person subject to a domestic violence restraining order from possessing a firearm in certain circumstances and determined that this statute "fits comfortably within" the Nation's tradition of "preventing individuals who threaten physical harm to others from misusing firearms." 602 U.S. at 690. This case represented the first time the Supreme Court applied *Bruen*'s two-step

14

framework.  *United States v. Gailes*, 118 F.4th 822, 825 (6th Cir. 2024).  As relevant here, the Supreme Court reiterated that *Bruen*'s historical inquiry does not require a challenged regulation to share a "historical twin" or that it be a "dead ringer." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30).  Instead, to pass constitutional muster, the law must be a "historical analogue" that "comport[s] with the principles underlying the Second Amendment."  *Id.* (quoting *Bruen*, 597 U.S. at 30); *id.* at 699–700.  At bottom, the appropriate analysis considers whether the challenged regulation is consistent with the principles that underpin the Nation's regulatory tradition.  *Id.* at 692 (citing *Bruen*, 597 U.S. at 26–31).

Based on the history and tradition of surety laws and "going armed" laws, which represented "two distinct legal regimes . . . that specifically addressed firearms violence . . ." and together support disarming those who "pose[] a clear threat of physical violence to another," the Supreme Court rejected a facial challenge to the statute.  *Id.* at 694–95 & 698.  "An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment."  *Id.* at 702.  In reaching this conclusion, the Supreme Court emphasized the temporary nature of the restriction on the fundamental constitutional rights under the Second Amendment that the statute placed on the defendant in that case.  *Id.* at 699.

### B.2.b. Sixth Circuit Precedent

Since *Berry*, and after the Supreme Court decided *Rahimi*, the Sixth Circuit upheld the constitutionality of Section 922(g)(1) under the Second Amendment and issued other rulings addressing charges under Section 922(g)(1).

### B.2.b.i. *Williams*

In *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024), the Sixth Circuit took up its first case bringing a constitutional challenge following *Bruen*.  In doing so, it began by examining pre-*Bruen* Circuit precedent and determined that *Bruen*'s history-and-tradition methodology displaced those prior precedents.  *Id.* at 645–48.

Analyzing the text of the Second Amendment, the court held that the right to keep and bear arms refers to "a liberty that predated the Bill of Rights," which the Second Amendment merely codified as a right that existed before ratification of the Bill of Rights and declared shall not be infringed.  *Id.* at 648–49 (citation omitted).  Further, the court recognized that this right "of the people" does not differentiate between felons and non-felons.  *Id.* at 649.  Therefore, the Second Amendment presumptively protects the right to keep and bear arms.  *Id.*

To determine whether Section 922(g)(1) impermissibly burdens that right, the *Williams* Court turned to *Bruen*'s second step—"whether [the] burden is consistent with the principles underpinning our historical tradition of regulating firearms."  *Id.* at 650 (citing *Rahimi*, 602 U.S. at 692).  The Sixth Circuit's examination of history and tradition found support for disarmament of persons and classes "deemed to be dangerous."  *Id.* at 657.  "Each time, however, individuals could demonstrate that their particular possession of a weapon posed no danger to peace."  *Id.*

In an as-applied challenge to Section 922(g)(1), the Sixth Circuit directed district courts to undertake a fact-dependent dangerousness inquiry that focuses on each individual's specific characteristics.  *Id.* at 657 & 660.  This inquiry takes into account a person's entire criminal record (and other relevant considerations), not just

the predicate offense for the charge under Section 922.  *Id.* at 657–58 & n.12; *see also id.* at 660.  Though largely *obiter dicta*, the court outlined three categories of offenses that generally speak, to varying degrees, to an individual's dangerousness.  *Id.* at 658–59 ("[C]ertain categories of past convictions are highly probative of dangerousness, while others are less so.").  These categories include:  (1) dangerous and violent crimes against a person, such as murder, rape, assault, and robbery; (2) crimes that place a person's safety at risk, justifying a finding of danger, such as robbery or drug trafficking; and (3) non-violent offenses, including various fraud and other white-collar crimes.  *Id.* at 658–59.  Offenses in the first category carry a strong presumption of dangerousness in light of the history for punishment of them.  *Id.* at 658.

Applying its analysis, the Sixth Circuit rejected an as-applied challenge in *Williams.*  *Id.* at 661–62.  "History shows that governments may use class-based legislation to disarm people it believes are dangerous, so long as members of that class have an opportunity to show they aren't."  *Id.*  Because of the defendant's criminal record, the court easily agreed that he was dangerous, justifying his disarmament.  *Id.* at 662.

### B.2.b.ii. Other Sixth Circuit Decisions

In cases following *Williams*, the Sixth Circuit has built on its historical analysis and upheld convictions under Section 922 in the face of other as-applied challenges.  For example, in *United States v. Goins*, 118 F.4th 794 (6th Cir. 2024), the court recognized that the Nation's history supports disarming those on parole, probation, or supervised release.  *Id.* at 801–02.  There, the defendant's history of

17

charges for driving under the influence over an eight-year period, resulting in four convictions, one of which involved a motor-vehicle accident, showed that he "pose[d] a danger to public safety." *Id.* at 804. Moreover, he possessed a firearm while on probation. *Id.* The Sixth Circuit analyzed the Nation's history and traditions going back to the Founding, acknowledging that "forfeiture of the estate, goods, or chattels upon conviction was common during the founding era." *Id.* at 802 (collecting treatises and legislation). As further justification, the Sixth Circuit reasoned that, "[a]fter conviction, the state's interest in protecting the public is even higher, especially given rates of recidivism." *Id.* (citing *Samson v. California*, 547 U.S. 843, 853–54 (2006)). Therefore, the Sixth Circuit determined that a "temporary deprivation of [the defendant's] Second Amendment right as a part of his probation for his felony offense thus comports with the historical tradition of pretrial incarceration." *Id.*

In *United States v. Gailes*, 118 F.4th 822 (6th Cir. 2024), the Sixth Circuit rejected a challenge to the constitutionality of Section 922(g)(9), which prohibits those convicted of domestic violence misdemeanors from possession of a firearm. In doing so, the court recognized that prior misdemeanor convictions for domestic violence can justify an individual's disarmament. *Id.* at 829.

In *United States v. Morton*, 123 F.4th 492, 499 (6th Cir. 2024), the Sixth Circuit rejected a challenge to Section 922(g)(1) as applied to a defendant who had a criminal history that included shooting at a prior girlfriend and her family and assault in a domestic incident.

18

And in *United States v. Risner*, 129 F.4th 361, 366–68 (6th Cir. 2025), the Sixth Circuit rejected a challenge to Section 924(c)(1) by relying on the first step in the analysis set forth in *United States v. Greeno*, 679 F.3d 510, 517–18 (6th Cir. 2012), placing *Risner* in tension with *Williams*.  *Cf.* 118 F.4th at 645–46.  Additionally, *Risner* rejected a facial challenge to the constitutionality of Section 922(g)(1) after the United States dismissed that charge, making the discussion on that issue largely *obiter dicta* in any event.  129 F.4th at 365.

*       *       *

In summary, the Sixth Circuit has largely agreed with the reasoning in *Berry*, reinforcing the constitutionality of disarming dangerous individuals, at least for a time—provided that they have an opportunity to show otherwise.  *See Williams*, 113 F.4th at 663.  In the context of an as-applied challenge, the determination whether a person is dangerous such that the government may lawfully disarm him, notwithstanding the guarantee of the Second Amendment, requires a fact-specific inquiry into the defendant's criminal record and other circumstances.  *Id.* at 657–58 & n.12, 660; *Goins*, 118 F.4th at 804–05.

## ANALYSIS

Under federal law, it is unlawful for any person "who has been convicted in any court of" a felony, to "possess in or affecting commerce[] any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(g)(1).  Put simply, under federal law, "a person who is convicted of a felony is prohibited from possessing firearms."  *United States v. Bean*, 537 U.S. 71, 74 (2002).  Defendants challenge the

19

constitutionality of the permanence of their disarmament under this statute, arguing that their prosecution for possessing a gun as a felon is inconsistent with the fundamental rights that the Second Amendment secures. The Court addresses the application of the statute to each Defendant.

## I.  As Applied to Mr. Copeland

In *Williams*, 113 F.4th at 662, the Sixth Circuit observed that "[o]ur nation's history shows that the government may require individuals in a disarmed class to prove they aren't dangerous in order to regain their right to possess arms." Therefore, it concluded that, "in an as-applied challenge to § 922(g)(1), the burden rests on [the defendant] to show he's not dangerous." *Id.* This aspect of the history and tradition of firearm regulation—shifting the burden to a person to prove his entitlement to a fundamental right—raises serious constitutional questions of its own. But the Court need not consider them here. The parties did not brief them. Indeed, Defendant acknowledged the burden placed on him in *Williams* and argued only that he can prove he is not dangerous such that his disarmament violates the Second Amendment. (ECF No. 31, PageID #139 & #143.)

Contrary to his argument (*id.*, PageID #144), the record demonstrates Mr. Copeland's dangerousness, and it does so in a way that avoids any question that reaches the temporal length of his disability. In short, Mr. Copeland was released from parole at the end of 2020. (ECF No. 6, PageID #30.) The substantive offense giving rise to that conviction involved two counts of drug possession. (*Id.*) Between the end of Mr. Copeland's supervision on December 17, 2020 and the events of September 10, 2024 giving rise to the indictment in this case (ECF No. 1, PageID #1),

20

not enough time passed to trigger constitutional concern about the permanence of Mr. Copeland's disability. Put another way, *Williams* places the burden on Mr. Copeland to prove he is not dangerous.

Defendant attempts to carry that burden by arguing that this conviction was not an offense against a person. (ECF No. 31, PageID #144.) But no evidence in the record provides any information about this offense. For example, it is not clear whether Mr. Copeland possessed amounts of drugs for personal use due to an addiction, whether he was involved in the distribution of narcotics, or whether something else entirely was going on. The fact that he also had a weapon suggests something more serious than getting caught with an amount of drugs for personal use, though there are other explanations. Whatever the case, *Williams* places the burden on Defendant, and the Court cannot say based on this record that he has met that burden.

Whatever the outer bounds of the Second Amendment's limitation on permanent disarmament, the amount of time between the end of supervision (for an offense the Court cannot say demonstrates dangerousness) and the events giving rise to the indictment in this case (just over three and a half years) does not violate Mr. Copeland's Second Amendment rights. Therefore, the Court determines that Defendant has not demonstrated that he is not dangerous, and his as-applied challenge to Section 922(g)(1) fails. *See Williams*, 113 F.4th at 662.

## II.    As Applied to Mr. Ross

Because Mr. Ross's "criminal record shows that he's dangerous, his as-applied challenge fails." *Id.* In making this determination, the Court undertakes a fact-

dependent dangerousness inquiry, focusing on Mr. Ross's specific characteristics. *Id.* at 657 & 660.  In 2018, Mr. Ross was convicted in federal court in connection with the events of June 10, 2018 discussed above.  (ECF No. 9, PageID #45–46.)  While intoxicated, he repeatedly pointed the muzzle of a firearm at a store clerk and two other customers.  (*Id.*)  He brandished a rifle then threated the police officers who responded to the incident.  (*Id.*)  After serving his prison sentence, his supervision ultimately terminated on July 9, 2023.  (*Id.*, PageID #45.)

The events giving rise to the charges against Mr. Ross in this case occurred on September 10, 2024.  (ECF No. 1, PageID #2.)  In other words, even less time passed between the end of his supervision and this offense than was the case for Mr. Copeland.  Without assessing the nature and circumstances of the offense that led to his arrest in this case, Defendant has not carried his burden under *Williams* to show that he is not dangerous.  113 F.4th at 662.  Like Mr. Copeland, Mr. Ross argues within the *Williams* framework, so the Court has no occasion to consider the constitutionality of the burden it places on him.  *Id.*

## III.  Permanence

Regarding Section 922(g)(1)'s permanency—in light of Congress's functional repeal of Section 925(c)—in an appropriate case the absence of relevantly "similar historical regulations permanently disarming a person without the opportunity for restoration points out an inconsistency with the Second Amendment that might require relief." *Berry*, 723 F. Supp. 3d at 592.  But as was the case in *Berry*, these cases do not present such circumstances.  "[T]he background of each Defendant before the Court places him among the group of dangerous persons whom the government

22

may disarm, at least on a temporary basis, and nothing suggests for [either] Defendant that the appropriate temporary period of disarmament has reasonably passed." *Id.* Moreover, there is no evidence in the record that either Defendant has pursued State or federal remedies in this regard. Therefore, Mr. Copeland and Mr. Ross's cases do not "present an appropriate occasion to identify or consider the many difficult questions under the Second Amendment that lie ahead either generally or for . . . these Defendants." *Id.* Those questions remain for another day.

## CONCLUSION

For all these reasons, the Court determines that the United States may enforce Section 922(g)(1) against Mr. Copeland and Mr. Ross consistent with the Second Amendment. Therefore, the Court **DENIES** Defendants' motions to dismiss the indictments against them. (ECF No. 27; ECF No. 31.)

**SO ORDERED.**

Dated: July 14, 2025

_____
      J. Philip Calabrese
      United States District Judge
      Northern District of Ohio

23