# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:25-cv-00025 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge Reuben J. Sheperd |
| | ) | |
| MARCUS COPELAND | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHRISTIAN ROSS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Late one night, police in Lorain, Ohio received a report of a shooting.  A short time later, a police officer saw a car roughly matching the description of a vehicle involved in the shooting and followed it.  When the driver turned without signaling, the officer stopped the vehicle and issued a written warning to its driver.  What happened next is the subject of dispute.  In short, a drug-sniffing dog or two alerted on the vehicle, prompting officers to search it and find two firearms, resulting in charges that the driver and passenger of the vehicle possessed these weapons in violation of federal law.

Defendants Marcus Copeland and Christian Ross move to suppress the evidence found in the search, contending that the search lacks probable cause.  A Magistrate Judge conducted an evidentiary hearing over two days and prepared a report and recommendation that the Court deny the motion.  Defendants object, and

the Court held oral argument on the matter. For the reasons that follow, on the unique series of events at issue in this case, the Court **SUSTAINS IN PART** Defendants' objections and **GRANTS** the motions to suppress.

## FINDINGS OF FACT

By a preponderance of the evidence, the record, including the Magistrate Judge's report and recommendation, the transcripts from the evidentiary hearings, and the exhibits and bodycam footage from the hearings, establishes the following facts.

### A.     The Traffic Stop

Around 12:30 a.m. on September 10, 2024, all officers on duty in the Lorain, Ohio police department were dispatched to the scene of a reported shooting. (ECF No. 61, PageID #326–28.) Among others, Officer Colton Jovanovski responded and assisted the investigation at the scene by canvassing and speaking to witnesses. (*Id.*, PageID #329–30.) During this work, one witness informed him that the shots were fired from a dark blue GMC Acadia or similar-style midsize SUV. (*Id.*, PageID #330.)

At approximately 1:00 a.m., Officer Jovanovski left to return to patrol. (*Id.*, PageID #331–32.) A short time later, he observed a dark blue Ford Explorer traveling about a mile from the scene of the shooting. (*Id.*; USA Exh. 14, at 2.) He noted that the vehicle was a dark blue midsize SUV like the one the witness to the shooting described and that it was situated within a reasonable distance from where the shooting occurred. (ECF No. 61, PageID #333; USA Exh. 14.) As Officer Jovanovski attempted to catch up to the vehicle, it stopped briefly in the roadway and made two abrupt turns without using turn signals. (ECF No. 61, PageID #334–35.) This

2

behavior suggested to Officer Jovanovski that the vehicle's occupants were trying to evade him.  (*Id.*, PageID #335–36.)  When the Ford Explorer eventually pulled into a driveway, Officer Jovanovski pulled in behind it.  (*Id.*)

At 1:07 a.m., he parked his patrol car behind the Ford Explorer and activated his lights.  (*Id.*, PageID #336–37; Jovanovski's Bodycam at 00:30.)  Over his radio, Officer Jovanovski was informed that his backup officer was delayed, and that additional units were being dispatched to assist him in his traffic stop.  (ECF No. 61, PageID #343–45.)

In the meantime, Officer Jovanovski approached the vehicle on foot and spoke with the occupants, explaining that he pulled them over for failing to use a turn signal.  (Jovanovski's Bodycam at 00:34–1:05.)  He identified the driver as Christian Ross and the passenger as Marcus Copeland.  (*Id.*, at 0:01:19–0:01:51.)  Officer Jovanovski returned to his patrol car to check their information through dispatch and his patrol software.  (*Id.* at 0:02:01–0:04:41; ECF No. 61, PageID #352–55.)  He was familiar with Mr. Ross and knew that he had a previous conviction for a firearms offense.  (ECF No. 61, PageID #353–54 & #358.)

K9 Officer Kyle Shawver arrived on the scene as backup and approached Officer Jovanovski as he sat working in his car.  (*Id.*, PageID #356–57; Jovanovski's Bodycam at 04:45–05:24.)  While Officer Jovanovski had been a Lorain police officer for less than four years, Officer Shawver was a veteran of almost ten years.  (ECF No. 61, PageID #322 & 436.)  Officer Jovanovski briefed Officer Shawver on the traffic violation, referenced Mr. Ross' history, and pointed out the resemblance between the

3

detained vehicle and the vehicle description provided by the witness to the shooting earlier that night. (*Id.*) Also, he suggested that either Officer Shawver or the delayed backup officer, Brandon Sayers, deploy his narcotics K9 on the suspect vehicle. (Jovanovski's Bodycam at 0:04:45–0:05:24; ECF No. 61, PageID #356 & 389–90.) Officer Shawver suggested that Officer Jovanovski first seek Mr. Ross' consent to search. (ECF No. 61, PageID #358.)

Following this conversation, Officer Jovanovski approached the Ford Explorer and asked Mr. Ross to step out. (*Id.*, Jovanovski's Bodycam at 0:05:28–0:05:55.) After promising not to give Mr. Ross a traffic citation for failing to signal, Officer Jovanovski requested consent to search his vehicle. (Jovanovski's Bodycam at 0:05:55–0:07:05.) Mr. Ross declined. (*Id.*) Then, Officer Jovanovski asked Mr. Copeland to exit the vehicle. (ECF No. 66, PageID #796.) He frisked the men for weapons, found none, indicated that he would issue a written warning, then went to complete the paperwork for the warning. (*Id.*)

### B. The First K9 Sniff

After making sure the vehicle was unoccupied, Officer Shawver retrieved his narcotics-trained K9 for an external sniff search of the Ford Explorer while Officer Jovanovski returned to his patrol car to prepare paperwork related to the traffic warning. (Jovanovski's Bodycam at 0:06:55–0:07:55.) At 1:14 a.m., Officer Shawver deployed Rye, a K9 trained and certified to detect methamphetamine, cocaine, and heroin, to sniff the outside of the parked and unoccupied vehicle. (ECF No. 61, PageID #439; Shawver's Bodycam at 0:16–01:24.)

4

Early in the sniff search, Officer Shawver's body camera picked up the sound of Rye's heavy breathing as well as some visual footage of Rye pacing and turning his head in the direction of the headlights.  (Shawver's Bodycam at 1:20–01:45.)  Later, Officer Shawver explained that this footage captured some of Rye's primary alert behaviors:  breathing changes, "head snaps" in which his head snaps back to the direction of the odor, and "bracketing," in which Rye moves back in forth along the edges where an odor is located and attempts to narrow in on its source.  (ECF No. 61, PageID #458–59 & #467–68.)  Although Rye was trained to locate the source of a narcotics odor and then to sit down as a "final passive response," sometimes he alerts to the presence of narcotics without sitting due to external constraints or because he cannot locate a source.  (*Id.*, at PageID #444–45.)

During this sniff search, the front driver's side of the Ford Explorer was parked near a chain-link fence.  (*Id.*, at PageID #468–69.)  At the point where Rye's circuit was about to take him past the driver's side door, Rye backed up and refused to proceed.  (*Id.*; Shawver's Bodycam at 1:50–2:07.)  Officer Shawver attributed this to the narrow space and the fact that a heavy wind was blowing all odors toward the headlights and the front of the car.  (ECF No. 61, PageID #468–69.)

Officer Shawver took Rye around the vehicle in the other direction, offering him access to the narrow space from the other side and rotating their course back and forth around the car.  (Shawver's Bodycam at 2:06–4:08.)  Although much of Rye's conduct was not captured clearly or within the camera frame, occasionally he can be seen turning his head toward the headlights and pacing around the vehicle.  (*Id.* at

1:30–1:46, 2:00–2:05 & 3:15–4:00.) At no point did Rye sit down to offer his "final indication." (ECF No. 61, PageID #473.) As he later explained, although Rye did not pinpoint a source, Officer Shawver deemed Rye to have alerted based on his breathing changes, head snaps, and the bracketing behaviors that Officer Shawver observed. (*Id.*, PageID #471–73.) He did not share his observations or conclusions with any other officer at the scene.

## C. The Second K9 Sniff

At 1:17 a.m., Officer Shawver ended Rye's sniff search. (Shawver's Bodycam at 4:04–4:25.) As he walked Rye back to their patrol car, he addressed K9 Officer Brandon Sayers, who recently arrived on the scene, and said, "I want to see yours too." (*Id.*) Officer Shawver explained to Mr. Ross, "I saw some behavior changes. I want to see if his dog does the same thing." (Shawver's Bodycam at 4:40–4:55.)

At the suppression hearing, Officer Shawver testified that he was confident Rye alerted to the presence of narcotics, and he only he asked Officer Sayers to deploy Echo because "[t]wo indications are better than one," and "[t]here is no standard that says you can't." (ECF No. 61, PageID #473–75 & #507.) Officer Jovanovski worked with Officers Shawver and Sayers and their respective dogs on many previous occasions, but he had never seen them deploy their K9s consecutively. (*Id.*, PageID #398–99.) Officer Shawver and Officer Sayers could not identify such an occasion either. (*Id.*, PageID #506 & #594.)

In response to Officer Shawver's directive, Officer Sayers retrieved his narcotics K9, Echo, to begin a second sniff search of the dark blue Ford Explorer. (Sayers' Bodycam at 2:45–4:08.) Officer Sayers became a K9 handler one year earlier;

6

he and Echo were "still getting [their] footing." (ECF No. 61, PageID #531–32 & #602.)  Like Rye, Echo was trained and certified to alert to the scent of methamphetamine, cocaine, or heroin by displaying alert behaviors such as heavy breathing, head snaps, and bracketing. (ECF No. 61, PageID #533, #536–37 & #556–58.)  Also like Rye, Echo's alert behaviors optimally culminate when he sits down as a "final indication" after locating the source of the odor, but he was known to alert sometimes without giving this final indication. (*Id.*, PageID #536–37.)  Officer Sayers' standard practice is to complete at least two K9 rotations around the subject of a sniff search, but Echo typically did not begin his detection process until his second rotation. (ECF No. 61, PageID #459–60 & #568.)  In the field, Officer Sayers and Echo typically performed as few as three rotations and as many as seven. (*Id.*, PageID #557 & #559.)

At 1:18 a.m., Officer Jovanovski stepped out of his car with the complete traffic warning for Mr. Ross. (Shawver Bodycam at 4:55–5:05.)  He approached Mr. Ross and informed him that the document was only a warning, not a citation, and that Mr. Ross would need to remain on scene while Officer Sayers' K9 completed his sniff. (*Id.*, 5:05–5:26.)

At the moment that Officer Jovanovski handed the warning to Mr. Ross, concluding all business related to the traffic violation, the clock on Officer Jovanovski's body camera read 1:18:55 a.m. (Jovanovski's Bodycam at 12:05.)  At that same moment, Officer Sayers and Echo began their sniff search of the Ford

Explorer while Officer Shawver watched from several feet away.  (Shawver's Bodycam at 5:25–5:30.)

Officer Shawver observed Officer Sayers and Echo carefully, sometimes craning his upper body visually to follow their path around the vehicle. (Jovanovski's Bodycam at 12:04–13:21.)  Later, he explained that he could not see all of Echo's conduct from where he stood, but he did see how Echo behaved at the front driver's side of the vehicle.  (ECF No. 61, PageID #475.)

Officer Sayers and Echo proceeded to walk a complete circuit around the vehicle.  (*Id.*, PageID #568.)  When they reached the narrow space between the fence and the front driver's side of the vehicle, Officer Sayers squeezed through and pulled Echo after him.  (*Id.*; Shawver's Bodycam at 5:25–5:50.)  Officer Shawver advised Officer Sayers to work around the narrow space rather than pass through it, and Sayers adopted a semicircular path in response to this feedback.  (Shawver's Bodycam at 5:50–6:40.)

Later, Officer Sayers testified that Echo displayed noticeable behavioral changes during their first semicircle, specifically, "deep inhaling whenever we reached the driver's side near the headlight grill area in the bumper . . . as well as a head snap from right to left." (ECF No. 61, PageID #569.)  For the most part, Officer Sayers' body camera captured very little of the sniff search beyond Echo's wagging tail and the sound of his breathing.  (Sayers' Bodycam at 4:00–4:58.)  But it did capture a notable segment of Echo's second semicircle.  (*Id.* at 4:58–5:27.)  When he reached the front driver's side on that second pass, Echo's rapid movement slowed to

8

the point where he stood in place for almost six seconds, and he turned his head from side to side and barked once. (*Id.* at 5:20–5:26.)

At this point, Officer Sayers gives no indication audibly or in his conduct that he intended to end the sniff search. (*Id.* at 5:26–28.) In fact, the bodycam footage shows Officer Sayers beginning to lead Echo back around the car. (*Id.*) From where he stood, however, Officer Shawver responded almost immediately to Echo's behavior at the front driver's side headlight. In the direction of Officer Jovanovski, he stated, "Yeah, they both hammered the . . . yeah, one hundred percent." (Shawver's Bodycam at 6:40–6:46.) Then, he shouted to Officer Sayers at the other end of the vehicle, "We're good, Brandon!" (*Id.* at 6:46–6:49; *see also* Sayers' Bodycam at 5:28.) Confirming this directive to stop the sniff search, Officer Sayers responded, "Okay, very good," continued his path past the vehicle to his patrol car, and returned Echo to it. (Sayers' Bodycam at 5:26–6:00.) It was 1:20 a.m. (*Id.* at 6:40–6:49.)

At the suppression hearing, Officer Sayers testified that he decided to end the sniff because he "observed clear, concise changes of behavior that are consistent with [Echo] being in the presence of the odor of narcotics." (ECF No. 61, PageID #572–73.) Further, he "decided that [he] would return and advise Officer Jovanovski that probable cause exists, and they can search the vehicle." (*Id.*, PageID #573.) But the bodycam footage contains no evidence that Officer Sayers recognized probable cause at the moment when Officer Shawver called him off. And Officer Sayers gave no testimony explaining why he did not communicate this determination to Officer Jovanovski or Officer Shawver on the scene.

9

D.     The Search of the Vehicle

After Officer Shawver told Officer Jovanovski that Echo alerted, he informed Mr. Ross that the officers would search the interior of his vehicle based on the results of the sniff searches.  (Shawver Bodycam at 6:51–7:00.)  When Mr. Ross asked him, "What are you searching my car for?" Officer Shawver responded, "Because the Supreme Court says we can."  Mr. Ross followed up, "For what?"  "For the positive alert on a motor vehicle."  (*Id*. at 6:50–7:15.)

As he continued to discuss the matter with Mr. Ross, Officer Shawver directed Officer Jovanovski to begin the vehicle search.  (Shawver's Bodycam at 7:00–7:10.)  Officers Jovanovski and Sayers then searched Mr. Ross' vehicle, locating two firearms and a small amount of cocaine residue on the front driver's side floorboard.  (ECF No. 61, PageID #365–66.)

## STATEMENT OF THE CASE

Defendants moved to suppress the firearms and ammunition that the officers discovered in the search of the vehicle.  (ECF No. 47; ECF No. 48.)  They argued that, once Officer Jovanovski issued a written warning for the traffic violation, no reasonable suspicion supported prolonging the traffic stop for the second K9 sniff.  (ECF No. 47, PageID #236-38; ECF No. 48, PageID #243-46.)  Accordingly, Defendants contend that evidence recovered as a result of the second sniff was unlawfully obtained.  (ECF No. 48, PageID #249–50.)

The Court referred the motion to the Magistrate Judge, who held an evidentiary hearing.  At the hearing, Officers Jovanovski, Shawver, and Sayers testified.  Defendants presented the testimony of an expert witness who suggested

10

that Rye and Echo did not provide probable cause for a search because neither dog gave a final indication.  (ECF No. 52; ECF No. 62, PageID #675–82.)  None of the testimony addressed or acknowledged Officer Shawver's role in calling the result of the second sniff.

On February 24, 2026, the Magistrate Judge issued a report and recommendation that the Court deny Defendants' motion to suppress.  (ECF No. 66.) The Magistrate Judge made findings of fact and determined that the first K9 sniff, which occurred within the duration of the original traffic stop, created reasonable suspicion that controlled substances were present in the car.  (*Id*., PageID #806–08.) This reasonable suspicion enabled officers to extend the traffic stop for the second K9 sniff, which yielded probable cause to search the vehicle.  (*Id*., PageID #808–10.)  The Magistrate Judge based this conclusion on his findings that (1) Rye exhibited alert behaviors that were captured on video, (2) Officer Shawver's unusual decision to conduct a second sniff search indicated that Rye's behavior fell short of establishing probable cause, particularly given his conduct at the scene, and (3) Officer Sayers' testimony about Echo's alert behaviors established probable cause.  (*Id*., PageID #808–09.)

Defendants objected to the report and recommendation on legal and factual grounds.  (ECF No. 67; ECF No. 71.)  Specifically, they object to the findings that the first K9 sniff resulted in reasonable suspicion to extend the investigation and that the second K9 sniff created probable cause for a search.  (ECF No. 67, PageID #812–17.)  Additionally, Defendants objected to language suggesting that Defendant

11

Marcus Copeland was the one driving the vehicle or that both defendants were previously known to officers, rather than just Defendant Christian Ross. (*Id.*, PageID #817–18.)

The Court held oral argument on the objections and asked counsel to address certain issues, including whether Officer Shawver could determine probable cause based on the behavior of a K9 for which he was not the handler. (ECF No. 72.) Following oral argument, the United States submitted a supplemental brief suggesting that Officer Sayers made his own probable cause determination and began to terminate Echo's deployment immediately before Officer Shawver directed him to stop. (ECF No. 77.)

During oral argument, the parties agreed that the objections relating to the identity of the driver and the factual recitation that Officer Jovanovski previously knew Mr. Copeland were scrivener's errors. Therefore, the Court **SUSTAINS** those objections and corrects the record through this ruling.

### STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(B) a judge may designate a magistrate judge to "conduct hearings, including evidentiary hearings" and submit "proposed findings of fact and recommendations for the disposition . . . of any motion excepted in subparagraph (A)." A motion to suppress falls within the exception in subparagraph (A); therefore, the Court reviews Defendant's objections de novo. *United States v. Raddatz*, 447 U.S. 667, 674 (1980). Similarly, under Rule 59(b)(3) of the Federal Rules of Criminal Procedure, the district judge must "consider de novo

any objection to the magistrate judge's recommendation." The judge "may accept, reject, or modify the recommendation. *Id.*

When conducting a de novo review, a court is not required to re-hear the matter, including any contested or disputed testimony. *Raddatz*, 447 U.S. at 674. Instead, the court makes a "de novo *determination*" of the portions of the record to which there is an objection. *Id.* With respect to credibility determinations, the district court may in the exercise of its discretion call and hear the testimony of a witness, but it is not obligated to do so or to hold a hearing. *Id.* at 676 (quoting *Campbell v. United States District Court for the Northern District of California*, 501 F.2d 196, 206 (9th Cir. 1974)).

## ANALYSIS

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. Warrantless searches and seizures are presumptively unreasonable, subject to a "few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).

As one exception, "a police officer may legally stop a car when he has probable cause to believe that a civil traffic violation has occurred." *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008). However, "once the purpose of the traffic stop is completed, a police officer may not further detain the vehicle or its occupants

13

unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *Torres-Ramos*, 536 F.3d at 550 (cleaned up). "Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring 'articulable reasons' and 'a particularized and objective basis for suspecting the particular person [is engaged in] criminal activity.'" *United States v. Payne*, 181 F.3d 781, 788 (6th Cir. 1999) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). The Fourth Amendment does not tolerate even brief extensions of a traffic stop unsupported by reasonable suspicion. *Rodriguez v. United States.*, 575 U.S. 348 (2015).

Warrantless searches of vehicles are also "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz*, 389 U.S. at 357). One such exception permits an officer to search a vehicle without a warrant if probable cause supports the search. *United States v. Ross*, 456 U.S. 798, 809 (1982). Probable cause means reasonable grounds for belief that the vehicle contains evidence of a crime, supported by less than *prima facie* proof but more than mere suspicion. *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). Put another way, probable cause exists where "there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir. 1994) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). In determining whether probable cause exists, a court does not look to events before or after the search or the subjective intent of the officers; instead, the Court considers

the objective facts known to the officers at the time of the search. *Smith v. Thornburg*, 136 F.3d 1070, 1075 (6th Cir. 1994). "[W]hether probable cause existed at the time of the search is a commonsense, practical question to be judged from the totality-of-the-circumstances." *United States v. Smith*, 510 F.3d 641, 648 (6th Cir. 2007) (citation and internal quotation marks omitted).

Where a trained and certified drug dog alerts to the presence of illegal drugs, it is "presume[d] (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 237, 247 (2013). Additionally, "a dog sniff conducted *during* a lawful traffic stop does not violate the Fourth Amendment's proscription of unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405 (2005)) (emphasis added). However, the Fourth Amendment does proscribe a dog sniff that occurs *after* the completion of the traffic stop—thereby extending the roadside detention of the driver beyond "the time needed to handle the matter for which the stop was made"—unless reasonable suspicion supports it. *Rodriguez*, 575 U.S. at 355.

## I.      The First K9 Sniff

The parties agree that the first sniff, involving Officer Shawver and his K9 Rye, was permissibly undertaken during a lawful traffic stop. (ECF No. 65, PageID #788 & #790.)   They dispute whether Rye's behavior provided the reasonable suspicion necessary to extend the traffic stop for further investigation or the probable cause that would permit a search of the vehicle. (*Id.*, PageID #790.)

The United States contends that Rye alerted to the presence of narcotic odor through head snaps, bracketing, and heavy breathing and that these alert behaviors

15

provided probable cause to search the vehicle.  (ECF No. 63, PageID #773–74.)  Also, it contends that Officer Shawver requested a second sniff merely because he "was not aware of any training prohibiting using two dogs to conduct K9 searches."  (*Id.*, PageID #773.)  In advancing these positions, the United States relies on Officer Shawver's testimony and expertise.  (*Id.*)

However, in the view of the Magistrate Judge, Officer Shawver's testimony that his dog Rye alerted conclusively and created sufficient probable cause for a vehicle search "is belied by the behavior of Officer Shawver in the immediate aftermath of the open-air sniff."  (ECF No. 66, PageID #807.)  Rather than communicating Rye's finding to his colleagues or directing them to commence a search, Officer Shawver took the unusual step of asking for a second opinion from another K9 and his handler.  The Magistrate Judge found that Officer Shawver's explanations for his conduct "appear to be no more than post-hoc rationalization." (*Id.*)  Based on video evidence showing Rye's conduct to be "at least generally consistent with the behavior indicative of a positive alert," the Magistrate Judge found that the Rye's sniff created reasonable suspicion of criminal activity.  (*Id.*, PageID #808.)

Defendants objected to this finding, noting that Rye never gave a final passive alert in response to the narcotic odors and that the surrounding circumstances did not create reasonable suspicion to believe that Defendants were involved in the shooting incident earlier that night.  (ECF No. 67, PageID #812–17; ECF No. 71.)

16

According to Defendants, a K9 cannot provide reasonable suspicion or probable cause unless he gives a final indication.  (ECF No. 87, PageID #815.)

On that last point, the federal courts have consistently taken a different view. A trained narcotics dog's alert to the presence of narcotics may give rise to probable cause even if the dog's behaviors do not culminate in a final indication.  *See United States v. Parada*, 577 F.3d 1275, 1281–82 (10th Cir. 2009) (finding that a trained dog's alert to the *presence* of narcotics produces probable cause even if he does not pinpoint the odor source through a final indication); *United States v. Holleman*, 743 F.3d 1152, 1156–57 (8th Cir. 2014) (distinguishing between a trained dog's "mere interest" in an object, which does not provide probable cause, and alert behaviors which provide probable cause even if they are not followed by a final indication). Indeed, the Fourth Amendment "does not require drug dogs to abide by a specific and consistent code in signaling their sniffing of drugs to their handlers." *United States v. Clayton,* 374 F. App'x 497, 502 (5th Cir. 2010).  "So long as officers are able to articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics, this Court will not engage itself in the evaluation of whether that dog should have used alternative means to indicate the presence of the drugs." *Id.*  Because a dog's alert may provide probable cause to conduct a search, it may also satisfy the lesser standard of reasonable suspicion.  *Romo v. Champion*, 46 F.3d 1013, 1020 (10th Cir. 1995); *see also United States v. Zacher*, 465 F.3d 336, 338–39 (8th Cir. 2006).

17

To determine whether a dog's behavior amounted to an alert that would provide probable cause or reasonable suspicion, courts look to the dog's reliability as a K9 trained to detect narcotic odors and to his communication with his handler. *Harris*, 568 U.S. at 246; *United States v. Howard*, 621 F.3d 433, 449 (6th Cir. 2010). A dog's reliability may be established by evidence of "satisfactory performance in a certification or training program." *Harris*, 568 U.S. at 246 (noting that field accuracy statistics are a poor measure of a K9's performance). Additionally, "the primary issue in determining the credibility of a dog's alert is not the capability or ability of a dog to accurately identify particular scents, but is instead the communication between the handler and the dog based on that indisputable ability." *Howard*, 621 F.3d at 449 (citation omitted). "This determination in turn rests almost entirely on the credibility of the dog handler's testimony because the handler is the only witness who can speak to the subjective interaction during a particular dog alert." *Id.* A defendant may challenge the results of a given sniff, including by questioning the dog's training or the K9 handler's performance. *Harris*, 568 U.S. at 247. Ultimately, a dog's alert is reliable if "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248.

Because all parties agree that Rye satisfactorily completed an approved training program, the present inquiry centers on whether Rye sensed an odor of narcotics coming from the vehicle and communicated that perception to Officer Shawver. (ECF No. 52-1.) The bodycam video of the sniff shows Rye breathing

18

heavily, pacing around the vehicle, and repeatedly turning his head in the direction of the headlights. (Shawver's Bodycam at 1:30–1:46, 2:00–2:05, 3:15–4:00.) These behaviors are consistent with Rye's primary alert behaviors, as Officer Shawver described them: breathing changes, "head snaps" in which his head snaps back to the direction of the odor, and "bracketing," in which Rye moves back in forth along the edges where an odor is located and attempts to narrow in on its source. (ECF No. 61, PageID #458–59.) Based on Rye's behavior as captured on the bodycam footage, he may have sensed, and alerted to, the odor of narcotics.

In Officer Shawver's testimony, he maintained that Rye did detect the odor of narcotics and that he communicated as much to his handler through his recognized alert behaviors. (ECF No. 61, PageID #471–75.) Officer Shawver strongly denied any uncertainty that Rye alerted. (ECF No. 61, PageID #474.) However, Officer Shawver's conduct after Rye's sniff is difficult to reconcile with a determination of probable cause. Rather than inform Officer Jovanovski that Rye alerted and that the officers could now proceed with a vehicle search, Officer Shawver communicated nothing about the first sniff. Instead, he directed Officer Sayers to deploy Echo for a second sniff. In his many previous experiences at police scenes with Officer Sayers and other K9 handlers, Officer Shawver never made a request of this kind. (*Id.*, PageID #398–99, #506 & #594.) To Mr. Ross, Officer Shawver offered an explanation that sounded uncertain, "I saw some behavior changes. I want to see if his dog does the same thing." (Shawver's Bodycam at 4:40–4:55.) These are not the words or actions of probable cause.

19

When Officer Shawver testified about these events, he portrayed his actions as pragmatic: "[Echo is] on scene.  He's a newer dog at that point.  Why not?  It doesn't extend the stop.  [It did extend the stop.]  Probable cause was already established. Two trained police dogs locating narcotic odor where narcotics were found, to me, states reliability."  (ECF No. 61, PageID #507.)  If Rye conclusively alerted, a second sniff was not needed.  To the contrary, seeking a second opinion, as it were, risked placing probable cause in jeopardy if Echo failed to alert.  Contrary to his testimony later, Officer Shawver's conduct during the second sniff suggests that he had doubts about Rye's alert.

For these reasons, the Court finds that the first sniff did not provide officers with probable cause to search the vehicle.  However, the bodycam video shows head snapping and "bracketing" at the front of the vehicle and captured changes in Rye's breathing.  These behaviors demonstrate reasonable suspicion to continue the stop. Accordingly, the Court **OVERRULES** Defendants' objections regarding the first sniff search.

## II.    The Second K9 Sniff

As with the first sniff, Defendants argue that the second sniff did not produce probable cause because Echo never gave a final indication.  (ECF No. 67, PageID #817.)    The United States argues that Echo demonstrated alert behaviors which provided Officer Sayers with probable cause to search the vehicle for narcotics.  (ECF No. 63, PageID #773–74.)  Based on Officer Sayers' testimony that he observed the alert and determined probable cause, the United States suggests that Officer Sayers

20

reached this conclusion silently *two seconds before* Officer Shawver directed him to end the sniff and took control of the scene.  (ECF No. 77.)

"[E]ach dog alerts in a different way, and the dog's behavior must be interpreted by his handler."  *United States v. Masterson*, 450 F. App'x 348, 349 (5th Cir. 2011).  "While the handler will recognize the dog's action as an alert, someone not familiar with the dog may not."  *United States v. Howard*, 448 F. Supp. 2d 889, 898 (E.D. Tenn. 2006), *aff'd,* 621 F.3d 433 (6th Cir. 2010).  K9 handlers are typically paired with a particular dog from the early stages of training because, "[w]hile training the dog is relatively simple, training a handler to correctly recognize how a dog responds to targeted narcotics typically requires more time and effort."  *Id.*  "Training plays the essential role in the communication of the alert between the dog and the handler."  *Id.*

Officer Sayers was the handler trained to work with Echo.  Through their training relationship, Officer Sayers was familiar with Echo's particular patterns during a drug sniff.  For instance, Officer Sayers testified that Echo typically rushes through his first circuit around a target object, to the extent that he generally considers Echo's first circuit "a wash."  (ECF No. 61, PageID #568.)  In their work together, Officer Sayers and Echo use a unique search command, apply their own standard procedure, and will sometimes do as many as seven circuits before declaring an outcome.  (*Id.*, PageID #552-54, #557 & #559.)

Notwithstanding this training and the relationship between Officer Sayers and Echo, Officer Shawver—not Officer Sayers—made the conclusive interpretation of

21

Echo's actions. He did so based on Echo's alert behavior on his second pass around the vehicle. But the law assigns the responsibility for making that determination to the dog's handler, Officer Sayers—not to an officer who has not trained with the dog, or to a judge with ample time to review the video evidence from miles away. To such other observers, Echo might appear to have alerted on that second pass. But what matters was the reaction of Officer Sayers.

On that score, the video evidence does not suggest that Officer Sayers made his own determination before Officer Shawver. In the two-second interval that the United States highlights, Echo appears interested in the driver's side headlight and Officer Sayers stands still as Echo works. (Sayers' Bodycam at 5:20–5:30.) Echo turns away from the car, then toward Officer Shawver. (*Id.*) But it is not clear whether Officer Sayers intended to walk back toward his cruiser on the street or to have Echo make another pass around the vehicle—after all, he normally did more passes around a car before making the determination that Echo alerted. He might have pulled on Echo's leash for either reason. (*See* ECF No. 77.) Indeed, Officer Sayers appears to have varied his grip throughout the sniff, and his gestures immediately before Officer Shawver's intervention do not suggest a change in course.

To the contrary, the bodycam footage confirms that Officer Shawver the determination of Echo's behavior meant on which probable cause depended. On the facts and circumstances presented, the law does not give him the authority to make that judgment. Even if it did, the Magistrate Judge made credibility determinations about Officer Shawver that the record supports. (*See, e.g.,* ECF No. 66, PageID #806

22

& #808.)  Those determinations preclude reliance on his credibility in connection with this second sniff search.  Additionally, the record offers no reason to believe that Officer Shawver ever trained with Echo or was familiar with his approach.

At the suppression hearing, Officer Sayers testified that he decided to end the sniff search because Echo alerted:

> Because I observed clear, concise changes of behavior that are consistent with him being in the presence of the odor of narcotics.  And through those changes of behaviors and him being in the presence of the odor of narcotics, I decided that I would return and advise Officer Jovanovski that probable cause exists, and they can conduct a search of the vehicle.

(ECF No. 61, PageID #572–73.)  The Magistrate Judge credited this testimony in recommending that the Court deny Defendants' motions to suppress.  (ECF No. 66, PageID #809.)  But no contemporaneous evidence from the scene supports this version of the facts.  Indeed, when Officer Shawver called off the search, Officer Sayers gave no indication that he agreed or that he saw probable cause based on an alert from Echo.  Nor did he communicate the results of the sniff search to Officer Jovanovski. Officer Shawver did.  Both the Magistrate Judge and Defendants' expert viewed Officer Sayers favorably.  (ECF No. 61, PageID #697; ECF 66, PageID #809.)  Therefore, the best explanation of his testimony is that, after the fact, he gave himself a bigger role in the events or simply misremembered them.  Whatever the reason, Officer Sayers' account of the events after the fact does not square with the contemporaneous bodycam evidence regarding the determination of probable cause.  The Court finds that Officer Shawver, not Officer Sayers, determined that Echo alerted, but under the law that decision was not his to make.

23

Because the remaining facts and circumstances did not provide probable cause to support searching the vehicle, the warrantless search that followed the second sniff violated the Fourth Amendment. *United States v. Banks*, 684 F. App'x 531, 535 (6th Cir. 2017). Perhaps if the Fourth Amendment permitted a *de minimis* exception for extending a traffic stop to conduct a sniff search for drugs, the result would be different. So too if inevitable discovery applied on the facts of this case, though the United States did not argue that it does.

## CONCLUSION

For the foregoing reasons, the Court **OVERRULES IN PART AND SUSTAINS IN PART** Defendants' objections (ECF No. 67; ECF No. 71) to the Magistrate Judge's report and recommendation (ECF No. 66) and **GRANTS** Defendants' motions to suppress (ECF No. 47; ECF No. 48.)

**SO ORDERED.**

Dated:  August 11, 2026

_____

J. Philip Calabrese
United States District Judge
Northern District of Ohio

24